

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                      :

**UNITED STATES OF AMERICA**,        :

                                       :

          – against –             :   **MEMORANDUM DECISION AND ORDER**

                                       :

**JASON ANTHONY**, also known as "Jason    :   23-CR-453 (AMD)
Piniero,"

                                       :

                             Defendant.      :
------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

Before the Court is the defendant's motion to suppress his cell phone and its contents, as well as all evidence obtained from the cell phone. The Court held a hearing on September 25, 2025, and denied the motion to suppress. This opinion explains the reasons for that decision.

## BACKGROUND[1]

### I.   The Initial Interview and Search

In November 2022, Special Agent Jonathan Hutchinson of Homeland Security Investigations ("HSI") received information from HSI's Cyber Crimes Center that a Viber account, using the name "Jason," was suspected of sharing child pornography in a Viber chatroom. (ECF No. 1 ¶ 3; Transcript of September 25, 2025 Motion Hearing ("H.") 12:3-19.)[2] Hutchinson traced the IP address to the defendant, who lived in Brooklyn. (H. 14:1-17.)[3] The

---

[1] The facts are drawn from the complaint, the hearing testimony, the parties' briefing, and the following exhibits: the audio recording and transcript of the agents' interaction with the defendant, the investigation report, the consent form the defendant signed, and the affidavit in support of the search warrant application.

[2] Viber is an encrypted mobile messaging application. (ECF No. 1 ¶ 3 n.2.)

[3] Viber provided subscriber information, in response to HSI's subpoena, for the account, including an email address and IP address. (H. 13:8-17.) Hutchinson determined that the IP address was associated with an account that belonged to Charter Communications, so he sent a preservation request to ensure

phone number for the account, which the Cyber Crimes Center also provided, was the defendant's.  (*Id.* 12:10-15, 15:4-11.)

On March 6, 2023, Hutchinson and Special Agent Thomas Jacques, both dressed in civilian clothing, went to the defendant's apartment at 510 Atlantic Avenue in Brooklyn, New York, and knocked on the door.  (ECF No. 1 ¶ 4; ECF No. 38-2, May 13, 2023 Report of Investigation ("Investigation Report") at 2; ECF No. 39, Audio Recording of March 6, 2023 Interview ("Audio Recording") at 00:40–00:50; H. 15:12-25, 20:13-20.)[4]  When the defendant opened the door, Hutchinson introduced himself and Jacques and explained that the defendant's "name came up in an investigation," that the defendant was "not in any trouble," and that the agents thought the defendant "could help [them] out trying to ID somebody."  (ECF No. 39, Audio Recording at 00:50–01:00.)  The defendant came out into the hallway.  (ECF No. 38-2, Investigation Report at 2; H. 17:14-20.)  The agents did not display any weapons.  (H. 17:21-22.)  Nor did they handcuff the defendant or restrain him.  (*Id.* 17:23–18:2.)

Hutchinson asked the defendant whether he had a Viber account, and the defendant responded that he did.  (ECF No. 38-2, Investigation Report at 2; ECF No. 39, Audio Recording at 01:40–01:50.)  Hutchinson explained that he had learned that child pornography was being distributed in a Viber chat room by an account registered to the defendant.  (ECF No. 38-2, Investigation Report at 2; ECF No. 39, Audio Recording at 01:52–02:12.)  He asked whether the defendant knew anyone in the chat room and how he got access to the chat room.  (ECF No. 39,

_____

that the account information was not destroyed.  (H. 13:21-14:5.)  Charter Communications provided subscriber information for the IP address.  (H. 14:6-8.)

[4] Hutchinson testified that it is standard practice for the child exploitation investigations team to record interviews with suspects.  (H. 16:7-14.)  Hutchinson thought that the defendant's voice was "a little unusual," and that he was "different than certain people in life," but it did not occur to him at the time that the defendant was "on the spectrum."  (H. 41:3-24.)  The defendant asserts that he has autism spectrum disorder.  (ECF No. 38 at 5.)

Audio Recording at 02:12–02:18.)  The defendant replied that he did not know anyone in the chat room and did not know how he got access to it.  (ECF No. 38-2, Investigation Report at 2; ECF No. 39, Audio Recording at 02:18–02:33.)  He said that he used his cell phone to get into the chat room, and that other people in the chat room sometimes sold child pornography.  (ECF No. 1 ¶ 4; ECF No. 38-2, Investigation Report at 2; ECF No. 39, Audio Recording at 02:46–03:35.)

The defendant also explained that moderators removed users who did not stay "active." (ECF No. 38-2, Investigation Report at 2; ECF No. 39, Audio Recording at 05:34–05:50.)  He confirmed that he used his own name and phone number for the Viber account, and that the account was still active.  (ECF No. 38-2, Investigation Report at 3; ECF No. 39, Audio Recording at 08:42–09:00; 09:55–10:12.)  When Hutchinson asked if someone had ever sent child pornography to the defendant's cell phone, the defendant responded, "Yeah," and said that he had recently received child pornography.  (ECF No. 1 ¶ 4; ECF No. 38-2, Investigation Report at 3; ECF No. 39, Audio Recording at 09:36–9:43, 10:12–10:20.)  He also explained that he usually deleted any child pornography that he received.  (ECF No. 1 ¶ 4; ECF No. 38-2, Investigation Report at 3; ECF No. 39, Audio Recording at 09:43–09:55.)

Hutchinson and Jacques asked how the defendant found the child pornography chat rooms and the differences between Viber and other messaging applications.  (ECF No. 38-2, Investigation Report at 3; ECF No. 39, Audio Recording at 10:33–11:55.)  The defendant said that the Viber child pornography chat rooms were usually titled "CP" or other names, and that he knew what the titles meant.  (ECF No. 38-2, Investigation Report at 3; ECF No. 39, Audio Recording at 11:55–12:46.)  The defendant said he never requested child pornography or said anything in the chats; he saw the content only in the chats, and did not download the content to

3

his phone.  (ECF No. 38-2, Investigation Report at 3; ECF No. 39, Audio Recording at 13:08–

14:07.)  At one point, Hutchinson said:

> I don't want you to think that -- we talk to people all day.  Nothing
> you can say -- you're, you're not a bad guy.  Like a lot of people
> are hesitant.  Oh yeah, child porn, I view it.  I download it -- it's
> not.  We talk about it all day.  Right?  We're going, kinda, after the
> big fish.  We don't -- people do this stuff, sadly.  It's, it happens,
> but it is what it is, right?  So if it happens to be in your phone, if it
> doesn't, if, if you delete it, if -- it's not a big deal.[5]  Okay?  I just
> wanted to say that before you finish this question.  I want you to
> feel at ease, right?

(ECF No. 39, Audio Recording at 14:05–14:38.)  Hutchinson asked if the defendant used his

laptop to get child pornography; the defendant said that he did not.  (*Id.* at 15:40–16:00; ECF No.

38-2, Investigation Report at 3.)  When the defendant asked if he was "like guilty of something,"

Hutchinson responded:

> No.  I mean, we're trying to learn more about this stuff cause
> we've got a few leads from -- about these Viber chatrooms and
> Telegram, [6] especially, so, um -- and especially leads about people
> that are in there.  Um, so we'd like to come and talk to them.  Um,
> the last thing we're gonna do, unless you have more questions --
> it's kind of standard procedure.  We'd like to take a look at your
> cell phone because any CP that -- I know you said it -- sometimes
> it's there, and you delete it.  That's fine.  We consider CP, um --
> any CP -- that still exists, like, a revictimization, right?

(ECF No. 39, Audio Recording at 17:24–18:02.)  The defendant said that he knew that

possessing and distributing child pornography is a federal crime.  (ECF No. 38-2, Investigation

Report at 4; ECF No. 39, Audio Recording at 18:03–18:13.)  Agent Hutchinson responded:

> It is.  It's a state crime, federal crime -- um, you'd be surprised the
> high standard that prosecutors require to prosecute – someone, to,

---

[5] According to the government's transcript, the last portion of this sentence is inaudible.  At the hearing, Hutchinson maintained that he could not tell whether he said, "It is not a big deal."  (H. 45:14–46:18.)  The defendant argues that he did.  The Court has listened to the audiotape and agrees that Hutchinson said, "It's not a big deal."

[6] Telegram is another encrypted mobile messaging application.  (ECF No. 40 at 5.)

> to decide to prosecute someone for possession of CP.  In my
> opinion, I don't know if someone like you or someone that's seen
> it in a chat room is guilty of it -- of, of that scrutiny.  It's not up to
> me.  Whatever.

(ECF No. 39, Audio Recording at 18:13–18:40.)  Hutchinson next explained that he and Jacques

wanted, with the defendant's consent, to search the defendant's cell phone, or have the defendant

show them the relevant applications.  (*Id.* at 18:40–19:03.)

At that point, the agents gave the defendant a written consent form, which reads in

relevant part:

> I, Jason Anthony Pineiro, have been informed by U.S. Immigration
> and Customs Enforcement (ICE) Special Agent J. Hutchinson of
> my right to refuse to consent to a search of my property . . . .  I
> have also been advised . . . that, if I voluntarily consent to a search
> of this property, anything discovered during this search may be
> used against me in any criminal . . . proceeding[].  I have decided
> to allow ICE Special Agents J. Hutchinson [and] T. Jacques to
> conduct a complete search of my iPhone 13 Pro Max [and]
> ass[ociated] installed [applications].

(ECF No. 40-1, Immigration and Customs Enforcement Consent Form ("Consent Form"); *see*

*also* ECF No. 1 ¶ 5; ECF No. 38-2, Investigation Report at 4.)  The defendant signed the form.

(ECF No. 40-1, Consent Form.)  Then, he scrolled through the Viber and Telegram applications

on his cell phone, which revealed multiple chat rooms, with names like "All CP Videos," "CP

Sex Group," and "Little Boy Pictures," where users had posted child pornography.  (ECF No. 1 ¶

5; ECF No. 38-2, Investigation Report at 4; ECF No. 39, Audio Recording at 22:53–28:10.)

There was a video of child pornography in the "photos" application on the defendant's cell

phone.  (ECF No. 1 ¶ 5; ECF No. 38-2, Investigation Report at 4; ECF No. 39, Audio Recording

at 28:22–28:51.)  The defendant could not remember where he got the video, but said he was

planning to delete it.  (ECF No. 38-2, Investigation Report at 4; ECF No. 39, Audio Recording at

28:52–29:04.)  The defendant nodded when Hutchinson asked him to confirm that he had child

pornography on his phone.  (ECF No. 38-2, Investigation Report at 4; *see also* ECF No. 39, Audio Recording at 33:45–33:55.)  Hutchinson and Jacques then took the defendant's cell phone.  (ECF No. 38-2, Investigation Report at 4; *see also* ECF No. 39, Audio Recording at 34:02– 34:35.)  They did not take the defendant into custody.  (ECF No. 39, Audio Recording at 34:13– 34:20.)

## II.    The Search Warrant and Subsequent Search

On March 23, 2023, the government applied to Magistrate Judge James R. Cho for a search warrant authorizing the government to search the defendant's cell phone.  (ECF No. 1 ¶ 6; ECF No. 40-2, Affidavit in Support of an Application for a Warrant to Search and Seize ("Warrant Aff.").)  In the supporting affidavit, Jacques said that HSI agents received information from the Cyber Crimes Center that someone believed to be the defendant was sharing child pornography in Viber.  (*Id.* ¶ 8.)  Jacques also described the agents' March 6, 2023 interview of the defendant, including that the defendant acknowledged using his cell phone "to access Viber chatrooms in which child pornography was sold and exchanged," and that he received child pornography.  (*Id.* ¶ 9.)  He also "confirmed that his Viber account was still active, but said that he frequently deleted child pornography shortly after receiving it."  (ECF No. 40-2, Warrant Aff. ¶ 9.)  In addition, Jacques described the contents of the defendant's cell phone, which the agents saw at the defendant's apartment: the chat rooms on the defendant's Viber and Telegram accounts titled "All CP Videos," "CP Sex Group," and "Little Boy Pictures," the images of child pornography that users posted, and the child pornography video in the "photos" application on the defendant's cell phone.  (*Id.* ¶ 10.)

Judge Cho signed the warrant.  Agents searched the defendant's cell phone, which had additional child pornography.  (ECF No. 40 at 6.)  The search also revealed that the defendant

sent child pornography to others at least four times, including to someone who appeared to be a minor.  (*Id.*)

## III.    Procedural History

The defendant was charged with possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B), and distribution of child pornography, in violation of 18 U.S.C. § 2252(a)(2).  (ECF No. 16.)  On August 4, 2025, he moved to suppress his cell phone, its contents, and all evidence from the search of his cell phone.  (ECF No. 38.) The government opposed.  (ECF No. 40.)  On September 25, 2025, the Court held a hearing at which Hutchinson testified.  (*ECF Minute Entry dated Sep. 25, 2025.*)

## DISCUSSION

In seeking suppression, the defendant concedes that he signed a consent to search form, but argues that the HSI agents coerced that consent by making "affirmative misrepresentations" to the defendant, who they "surely knew was vulnerable."  (ECF No. 38 at 2.)  The defendant maintains that the agents deceived him by minimizing the seriousness of the investigation, including by telling him, in response to his question, that he was not in trouble.  (*Id.*)  The government responds that the defendant does not have standing to challenge the search because he submitted his affidavit asserting ownership of the cell phone belatedly.  (ECF No. 40 at 10–11.)  Second, the government argues that the defendant consented to the search.  (*Id.* at 14–17.)  Third, the government asserts inevitable discovery, because the agents could have gotten a search warrant before they went to the defendant's apartment.  (*Id.* at 18–19.)  Finally, the government maintains that the agents relied on the search warrant in good faith.  (*Id.* at 21.)

## I.    Standing

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978).  A defendant's Fourth Amendment rights are thus violated "only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party." *United States v. Payner*, 447 U.S. 727, 731 (1980) (emphasis in original).  "[T]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas*, 439 U.S. at 130 n.1.  "On a motion to suppress evidence for failure to satisfy the Fourth Amendment, '[t]he defendant bears the burden of proving . . . that he had a legitimate expectation of privacy.'" *United States v. Ray*, 541 F. Supp. 3d 355, 379 (S.D.N.Y. 2021) (quoting *United States v. Watson*, 404 F.3d 163, 166 (2d Cir. 2005)).  That burden ordinarily is carried by the submission of sworn declarations.  *Id.*

After the government argued in its response to the defendant's motion that the defendant had not established standing to challenge the search of his phone, the defendant filed an affidavit, with his reply, in which he stated that "the cell phone HSI agent took" from him "[o]n March 6, 2023" "belonged to [him]."  (ECF No. 41-1.)  The government does not challenge the substance of the affidavit.  Instead, it presses the technical objection that the defendant should have filed the affidavit with his motion, and that the Court should deny the motion on that basis.  (ECF No. 40 at 12 n.9.)

The defendant has established that he had a legitimate expectation of privacy in the cell phone.  *See Ray*, 541 F. Supp. 3d at 380 ("Because [the defendant] has averred that he owns [a telephone number, email, and iCloud accounts], he has established a legitimate expectation of privacy with respect to those accounts sufficient to assert his Fourth Amendment rights.");

*United States v. Lauria*, No. 19-CR-449, 2020 WL 5743523, at *5–6 (S.D.N.Y. Sep. 25,

2020), *vacated on other grounds*, 70 F.4th 106 (2d Cir. 2023) (the defendants' affirmations that

certain cell phone and iCloud accounts belonged to them was sufficient to establish standing for

a Fourth Amendment challenge); *United States v. Herron*, 2 F. Supp. 3d 391, 400–01 (E.D.N.Y.

2014) (the defendant had a legitimate expectation of privacy in a cellphone registered to another

individual, where he provided an affidavit stating that he was the sole and exclusive user of

that cellphone).  The fact that he filed his affidavit with his reply rather than with his motion is

not a sufficient basis to deny his motion.  *See Ray*, 541 F. Supp. 3d at 379 (considering a sworn

declaration that the defendant submitted in response to the government's argument that he failed

to submit any sworn declaration); *United States v. Pulliam*, No. 24-CR-377, 2025 WL 968582, at

*2 (S.D.N.Y. Mar. 31, 2025) (considering an affidavit filed with the defendant's reply in support

of his motion to suppress).

## II.    The Initial Search

"'It is . . . well settled that one of the specifically established exceptions' to the Fourth

Amendment requirements that private property not be searched without a search warrant issued

upon probable cause 'is a search that is conducted pursuant to consent.'"  *United States v.

O'Brien*, 926 F.3d 57, 75 (2d Cir. 2019) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219

(1973)).  When the government "tries to establish that it searched property on the basis of

consent, it 'has the burden of proving, by a preponderance of the evidence, that a consent to

search was voluntary.'"  *United States v. Pecoraro*, 568 F. Supp. 3d 169, 182 (N.D.N.Y. 2021)

(quoting *United States v. Gandia*, 424 F.3d 255, 265 (2d Cir. 2005)).  "This means that the

Government must show that the facts demonstrating consent are 'more probably true than

false.'"  *United States v. Garcia*, 554 F. Supp. 3d 421, 429 (E.D.N.Y. 2021) (quoting *Nissho-*

*Iwai Co. v. M/T Stolt Lion*, 719 F.2d 34, 38 (2d Cir. 1983)).  The "appropriate Fourth

Amendment question is 'whether a consent to a search was in fact 'voluntary' or was the product

of duress or coercion, express or implied.'"  *O'Brien*, 926 F.3d at 75 (quoting *Schneckloth*, 412

U.S. at 219).

Courts do not "deviate from the traditional definition of voluntariness," which "is a

question of fact to be determined from the totality of all the circumstances."  *Id.* (citations

omitted).  Relevant factors include "the youth of the [consenting person], his lack of education,

his low intelligence, the lack of any advice . . . of his constitutional rights, the length of

detention, the repeated and prolonged nature of questioning, whether the [consenting person] was

in custody and in handcuffs, whether there was a show of force, whether the [government] agents

told the [consenting person] that a search warrant would be obtained, whether the [consenting

person] had knowledge of his right to refuse consent, and whether [the consenting person] had

previously refused consent."  *Garcia*, 554 F. Supp. 3d at 429 (alterations in original) (quoting

*United States v. Schaefer*, 859 F. Supp. 2d 397, 407 (E.D.N.Y. 2012), *aff'd*, 519 F. App'x 71 (2d

Cir. 2013)).[7]  "The 'ultimate question' at issue in determining whether consent to a search was

voluntary is whether 'the officer had a reasonable basis for believing that there had

been consent to the search.'"  *Pecoraro*, 568 F. Supp. 3d at 182 (quoting *United States v. Garcia*,

56 F.3d 418, 423 (2d Cir. 1995)).  The government has satisfied its burden.

The defendant argues that the HSI agents "engaged in a pattern of deception so extreme

that it overcame [the defendant's] will and rendered his consent to search his phone involuntary."

(ECF No. 38 at 2.)  The defendant cites the following evidence: (1) that Hutchinson said "no"

---

[7] "[T]he government has no affirmative obligation to advise the defendant of his right to refuse consent to search; rather, that is one factor to be taken into account in determining voluntariness."  *Schaefer*, 859 F. Supp. 2d at 407.

when the defendant asked if he was "like guilty of something," (2) that Hutchinson described the

child pornography on the defendant's phone as "fine" and not a "big deal," (3) that Hutchinson

led the defendant to believe he was not a target because they were going after the "big fish," and

(4) that Hutchinson commented about the "high standard that prosecutors require to prosecute

someone" for possession of child pornography, and then said that he did not know if "someone

like" the defendant would be "guilty . . . of that scrutiny." (ECF No. 38 at 7–10.) According to

the defendant, these statements are not "the typical 'half truths' or 'calculated silence' by law

enforcement that has been deemed a legitimate tactic by courts." (*Id.* at 7.) Instead, the

defendant says, Hutchinson's comments were the equivalent of promises of immunity. The

government responds that while Hutchinson may have "minimiz[ed]" the defendant's liability,

his remarks fell "far below" the threshold for finding the defendant's consent involuntary. (ECF

No. 40 at 15.)

"It is well-established that 'in the detection of many types of crime, the Government is

entitled to use decoys and conceal the identi[t]y of its agents.'" *United States v. Monzon-Luna*,

No. 11-CR-722, 2013 WL 6175818, at *5 (E.D.N.Y. Nov. 22, 2013) (alteration in original)

(quoting *United States v. Alejandro*, 368 F.3d 130, 136 (2d Cir. 2004)). "Thus, the use of

trickery and deception by law enforcement officers 'does not itself require or preclude a finding

that an authorized person voluntarily consented to a search. Rather, the totality of all

circumstances—including, naturally, the nature of the deception used—must still be considered

in determining whether such consent was voluntarily given.'" *Id.* (quoting *United States v.

Montes–Reyes,* 547 F. Supp. 2d 281, 290 (S.D.N.Y. 2008)); *see also United States v. Peterson*,

No. 18-CR-49, 2018 WL 6061571, *6 (D. Conn. 2018) ("[L]aw enforcement's use of deception

is a factor that courts should consider when determining from the totality of all the circumstances

whether a defendant's will was overborne in a particular case." (citation omitted)).  If consent is given on the basis of "police misrepresentation of purpose," it is only invalid where it is "so extreme" that "a person is 'deprived of the ability to make a fair assessment of the need to surrender his privacy.'" *Montes–Reyes,* 547 F. Supp. 2d at 288 (quoting Wayne R. LaFave et al., *Criminal Procedure* § 3.10(c) (3d ed. 2007)).

Tricking a suspect into thinking that there is "a life-threatening emergency, and that his consent to search [is] required to prevent [an] impending calamity" is the "leading example" of "deception which ought not to be tolerated."  *Montes-Reyes*, 547 F. Supp. 2d at 288, 288 n.8 (citations omitted); *see also id.* at 291 ("A false claim of a missing child is precisely the kind of extreme misrepresentation of investigatory purpose by which a person is deprive[d] . . . of the ability to make a fair assessment of the need to surrender his privacy." (citation omitted)); *United States v. Giraldo*, 743 F. Supp. 2d 152, 154 (E.D.N.Y. 1990) (consent given to agents disguised as gas company workers to enter the defendant's home to check for a gas leak was involuntary because the defendant's "only free choice . . . was to have refused entry to the gas company and risk blowing up himself and his neighbors" (internal quotations omitted)).

Similarly, consent is not the "product of an essentially free and unconstrained choice" when "the person whose consent is sought is left with the impression that his consent cannot be lawfully withheld."  *Montes-Reyes*, 547 F. Supp. 2d at 287 (citation omitted).  The "foundational" example of this kind of deception is "law enforcement agents falsely claim[ing] that they already possess a warrant to search the premises."  *Id.*; *see Bumper v. North Carolina*, 391 U.S. 543, 550 (1968) ("When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search.

The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent.").

On the other hand, courts have found that "innocuous" misrepresentations are permissible. In *United States v. Monzon-Luna*, HSI agents got into Monzon-Luna's apartment by claiming that they were looking for someone who stole a cell phone, when they were really looking for a sex trafficking victim. 2013 WL 6175818, at *1–2. The court concluded that this was "hardly the type of ruse that would deprive an individual of the ability to make a fair assessment of the need to surrender his privacy;" "[a]lthough the ruse misrepresented the true purpose of the agents' visit and capitalized on Monzon–Luna's desire to assist law enforcement, it did not create a false sense of exigent circumstances that deprived the defendant of his ability to assess the need to surrender his privacy." *Id.* at *5 (citation omitted). The facts were distinguishable from "ruses in *Montes–Reyes* and *Giraldo*" because a "search for a stolen cell phone is wholly distinguishable from a search for a missing child or an imminent gas explosion." *Id.*; *see also United States v. Funds in the Amount of $830,000 in United States Currency*, No. 18-CV-1537, 2019 WL 95169, at *8–9 (N.D. Ill. Jan. 3, 2019) (agents claiming that they "were conducting 'random' interviews" when they had "in fact . . . targeted the [defendants] as suspicious travelers" was not "akin to those cases in which consent was invalidated" because "[t]here is nothing coercive about telling a passenger that they were approached randomly"); *Peterson*, 2018 WL 6061571, at *6 ("[W]hile the officers may have led [the defendant] into falsely believing that he was the victim, rather than the suspect, in their investigation, the officers' representations that they were interested in his robbery and assault were neither false nor wholly unconnected from their investigation of [the defendant] for firearms offenses.").

Courts have also found that downplaying the seriousness of a defendant's conduct is a permissible tactic. In *United States v. Dzionara-Norsen*, an FBI agent questioning Dzionara-Norsen about child pornography said that the agents "normally dealt with more 'important' matters, but that they wanted to talk to him regarding his child pornography activity in order to ensure that he was not someone that they needed to be 'concerned about' or 'target.'" No. 19-CR-6131, 2020 WL 1897179, at *2 (W.D.N.Y. Apr. 17, 2020), *report and recommendation adopted*, No. 19-CR-6131, 2020 WL 3401267 (W.D.N.Y. June 18, 2020), *aff'd*, No. 21-CR-454, 2024 WL 191803 (2d Cir. Jan. 18, 2024). The agent said that he did not believe that Dzionara-Norsen was "producing child pornography or was associated with young children," and that he wanted to ensure that Dzionara-Norsen got "counseling." *Id.* The court observed that the agent's "conduct during the interview included statements meant to minimize the seriousness and the criminal character of the investigation;" the agent "suggested that [the defendant] was not a 'target' and that the main purpose of the agents' interview was to ensure that he got counseling." *Id.* at *12. Nevertheless, the agent also asked the defendant if he knew that the conduct was illegal, and after Dzionara-Norsen signed the consent form, explained that the prosecutor was the one who would decide whether to bring charges. Under these circumstances, the agent's tactics were not "sufficiently coercive or deceptive so as to deprive [the defendant] of his 'ability to make a fair assessment of the need to surrender his privacy' and to render his consent involuntary. *Id.*; *see also United States v. Colon-Gentile*, No. 12-CR-777, 2014 WL 2157541, at *4 (E.D.N.Y. May 23, 2014) (telling the defendant that his "cooperation could maybe help" with "find[ing] those people who are actually making [ ] child pornography," and "that he was not in trouble," was not sufficiently deceptive, because the agents did not "state or suggest that [their investigation] . . . could never lead to criminal charges being lodged against him").

In this case, Hutchinson also downplayed the seriousness of the defendant's conduct. When the defendant asked if he was "like guilty of something," Hutchinson said, "No." (ECF No. 39, Audio Recording at 17:24–18:02.) He also described the contents of the defendant's phone as "fine" and no "big deal." (*Id.* at 14:05–14:38.) He said that he did not know if "someone like" the defendant would be "guilty" under the "high standard that prosecutors require to prosecute someone" for possessing child pornography. (*Id.* at 18:13–18:40.) In addition, Hutchinson suggested that the defendant was not a target, and that he could perhaps help them find the "big fish" and prevent the "revictimization" of the subjects of the child pornography. (*Id.* at 14:05–14:38, 17:24–18:02.) These statements, while misleading, were permissible. Hutchinson did not tell the defendant that there was a life and death emergency, as the agent did in *Montes–Reyes* and *Giraldo*, nor did he claim that he already had a warrant, like the agents did in *Bumper.* Hutchinson's statements — that the contents of the defendant's phone were "fine" and not a "big deal," and his suggestion that the defendant was not a target — were more akin to the agent's statements in *United States v. Dzionara-Norsen*. That agent told Dzionara-Norsen that "they normally dealt with more 'important' matters" and did not think that Dzionara-Norsen was "producing child pornography or was associated with young children." 2020 WL 1897179, at *2.

A somewhat closer call is Hutchinson's remark about whether the defendant would qualify under the "high standard that prosecutors require to prosecute someone" for possession of child pornography, as is his response when the defendant asked if he was "like guilty of something;" Hutchinson said, "No." Considered in the context of the entire conversation, however, these comments did not deprive the defendant of the "ability to make a fair assessment of the need to surrender his privacy." *Montes–Reyes,* 547 F. Supp. 2d at 288. The agents spoke

with the defendant for almost fifteen minutes before Hutchinson made the first challenged statement. In that time, Hutchinson told the defendant that his name had come up in an investigation and that they had information that child pornography was being distributed in a Viber chat room from an account registered to the defendant's phone number and connected to his IP address. (ECF No. 39, Audio Recording at 00:50–03:35.) Before the defendant consented to a search of his phone, he also said that he knew possessing and distributing child pornography was a federal crime. (*Id.* at 18:03–18:13.) And while Hutchinson mentioned the "high standard" for prosecuting people for possession of child pornography, he also said that the decision was "not up to me." (*Id.* at 18:13–18:40.)

The defendant also argues that Hutchinson made "*de facto* promises of immunity." (ECF No. 38 at 5.) "Material misrepresentations based on unfulfillable or other improper promises might perhaps overbear a defendant's will." *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995). However, "voluntariness is not vitiated merely because law enforcement uses persuasion or offers a 'good deal' to entice consent from a defendant." *Peterson*, 2018 WL 6061571, at *13 (quoting *United States v. Munoz*, 987 F. Supp. 2d 438, 445 (S.D.N.Y. 2013)). Courts also differentiate between unequivocal promises, which may make consent involuntary, and implied promises. *See, e.g.*, *United States v. Marsden*, No. 11-CR-10, 2011 WL 4036598, at *3 (D. Vt. Sep. 12, 2011) (distinguishing a case "where the defendant was unequivocally promised he would not be charged" from the defendant's argument that officers "impl[ied] leniency" in concluding that "the discussion of leniency alone was not so coercive as to overbear [the] [d]efendant's will"); *United States v. Lucas*, 338 F. Supp. 3d 139, 162 (W.D.N.Y. 2018), *aff'd*, No. 19-CR-3937, 2021 WL 3700944 (2d Cir. Aug. 20, 2021) (finding a statement was voluntary where the agent discussed cooperation and potential benefits "in only a very generalized

16

manner," as opposed to explicit promises in exchange for cooperation).[8]  Ultimately, "[i]n

assessing the totality of the circumstances, vague promises of leniency for cooperation are just

one factor to be weighed in the overall calculus and generally will not, without more, warrant a

finding of coercion."  *Marsden*, 2011 WL 4036598, at *2 (quoting *United States v. Gaines*, 295

F.3d 293, 299 (2d Cir. 2002)).

The parties both say that *United States v. Haak*, 884 F.3d 400 (2d Cir. 2018) supports

their positions.[9]  There, the Second Circuit reversed the district court's finding that an officer got

Haak to cooperate by falsely implying that Haak would be immune from prosecution.  *Id.* at

410–15.  According to the panel, the only statement "providing any support for that conclusion"

was the officer's "assertions that he was not looking 'to come after'" the defendant.  *Id.* at 411.

However, "viewed in [the] context" of "repeated[] emphasi[s]" that the defendant "was not being

placed under arrest," the more reasonable interpretation was that the officer would not arrest

Haak that night, not that he was promising Haak would not be prosecuted.  *Id.*  The court did not

"deny the possibility of police exceeding their authority by improperly promising immunity" but

"such an improper promise should not readily be implied" where "(1) the words spoken—'not

looking to come after you'—can also signify forbearance of arrest, within police authority; (2)

police honored their promise not to arrest Haak; and (3) all other circumstances indicate a

'routine, benign, and noncoercive' interview."  *Id.* at 411–12.  The court's conclusion was

---

[8] The defendant also cites *United States v. Montgomery*, 555 F.3d 623, 629 (7th Cir. 2009) for the proposition that "a false promise of leniency may be sufficient to overcome a person's ability to make a rational decision about the courses open to him."  (*See* ECF No. 38 at 6.)  However, that court ultimately found that there was no explicit promise of immunity; although the "information that [the officer] gave [Montgomery] [about a maximum prison sentence] was inaccurate," Montgomery "was not promised a ten year sentence if he confessed or made a statement."  *Montgomery*, 555 F.3d at 630.

[9] Haak claimed that agents coerced his confession.  As the defendant points out (ECF No. 38 at 8 n.2), a "similar test of voluntariness applies to confession and consent search."  *United States v. Guarno*, 819 F.2d 28, 31 (2d Cir. 1987) (quoting *Schneckloth*, 412 U.S. at 223–27).

"further supported by the fact that [the officer] effectively explained to [Haak] the reason he was not then looking to arrest him: [Haak] was not among the 'number one targets.'" *Id.* at 412. The court also cited the officer's other statements, which "hardly communicated to [him] that he would never be charged for his own criminal conduct:" that his situation was "very serious" since he was caught up in a "death investigation" and that the evidence "could look very bad" for him. *Id.*

While Hutchinson and Jacques did not emphasize the defendant's potential criminal liability the way that the officer did in *Haak,* they also did "not clearly and unmistakably promise [the defendant] immunity from prosecution." *Id.* at 416. As explained above, the agents may have downplayed the seriousness of the defendant's conduct and misled him about their intentions, but those are permissible ruses. Hutchinson did not promise the defendant leniency if he signed the consent form; in fact, Hutchinson said that whether to prosecute the defendant was "not up" to him.

Moreover, the agents' statements, although important, are only one of the factors the Court considers in looking at the "the totality of all the circumstances." *O'Brien*, 926 F.3d at 76. The defendant asks the Court to consider his "obvious mental and psychological deficits." (ECF No. 38 at 1, 5.) The government responds that "notwithstanding any 'odd vocal cadence,'" the defendant was "an adult living independently and enrolled in college" and "appeared coherent and responsive throughout the encounter," (ECF No. 40 at 14), which the defendant does not dispute.[10] Whatever the defendant's vulnerabilities, the record establishes that he was capable of

---

[10] Although a defendant's mental condition or capacity may be a "significant factor in the 'voluntariness' calculus," this "does not justify a conclusion that his mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" *Colorado v. Connelly*, 479 U.S. 157, 164 (1986). "In other words, the police must somehow overreach by exploiting a weakness or condition known to exist." *United States v. Robertson*, 19 F.3d 1318, 1321 (10th Cir.), *cert. denied*, 513 U.S. 906 (1994); *see also Miller v. Dugger*, 838 F.2d 1530, 1537 (11th

giving consent. He acknowledged, without prompting, that possessing and distributing child

pornography is a federal crime. (ECF No. 38-2, Investigation Report at 4; ECF No. 39, Audio

Recording at 18:03–18:13.) He was rational and coherent in describing how Viber works, and in

answering the agents' questions. He also signed the written consent form, which advised him

that he had the right to refuse to consent to a search of his property and that anything discovered

during the search could be used against him in a criminal proceeding. (ECF No. 40-A, Consent

Form.) The defendant does not dispute the adequacy of this advice or claim that he could not

read or understand it.

The Court must also consider whether the circumstances of the interview were inherently

coercive. They were not. The agents spoke to the defendant at his home, respectfully and in a

conversational tone. They did not yell, threaten or intimidate him, or use physical force against

him. They did not handcuff him, display their weapons, or tell him that he could not leave. The

interview was not especially long, and the defendant was not deprived of sleep or food. Finally,

the agents did not take the defendant into custody.[11] Considering totality of these circumstances,

the defendant was not "deprive[d] . . . of the ability to make a fair assessment of the need to

surrender his privacy." *Montes–Reyes,* 547 F. Supp. 2d at 288; *see Dzionara-Norsen*, 2020 WL

1897179, at *11 (finding consent to search a laptop voluntary where the "interview was

conducted just outside of [the defendant's] apartment, he was not restrained, no physical force

---

Cir.) ("*Connelly* makes clear that even the interrogators' knowledge that a suspect may have mental problems does not make the suspect's statements involuntary unless the police exploited this weakness *with coercive tactics*" (cleaned up)).

[11] This is plainly a much different case than *United States v. Garcia*. In that case, the defendant was "severely lacking in education" and "less psychologically stable than the average person;" she probably could not understand the consent form because she read Spanish at a fourth-grade level, and the officer mistranslated the contents of the form to her; and the multiple armed police officers in her apartment for over twelve hours created an "intimidating" atmosphere. *Id.* at 433–35.

was used against him," the agents "spoke in a conversational tone, were dressed in plain clothes,

displayed no weapons, and made no threats or promises to [the defendant] to induce him to speak

or to provide his consent," and the defendant, "an adult living independently, appeared coherent

and responsive throughout the interview" despite his mental health issues); *Schaefer*, 859 F.

Supp. 2d at 407 (finding consent to a search voluntary where "the defendant was approached at

his own residence during the early evening," "the two agents and detective who came to his

home to speak with him were in plain clothes, and their weapons were not drawn," "the agents

asked the defendant for permission to enter his home, which he granted," "the agents introduced

themselves and stated that the reason for the visit related to child pornography," "the defendant

was never handcuffed or placed in custody by the agents," "the entire interview and search took

one-half hour," "no threats or promises were made to the defendant," and the defendant "orally

consented to the search and also signed a written consent form" that "advised him of his right to

refuse consent").

### III.    Inevitable Discovery

Even if the defendant did not voluntarily consent to the search of his phone, suppression

is unwarranted under the inevitable discovery doctrine, which "allows for the admission of

evidence that would have been discovered even without the unconstitutional source." *Utah v.

Strieff*, 579 U.S. 232, 238 (2016). A court should admit evidence if "it has a high level of

confidence that the warrant in fact would have issued and that the specific evidence in question

would have been obtained by lawful means." *United States v. Price*, No. 17-CR-301, 2017 WL

4838307, at *6 (E.D.N.Y. Oct. 23, 2017), *aff'd*, 845 F. App'x 85 (2d Cir. 2021) (quoting

*United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006)). This requires the "district court to

determine, viewing affairs as they existed at the instant before the unlawful search occurred,

what *would have happened* had the unlawful search never occurred." *United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013) (quoting *United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992)) (emphasis in original).  The doctrine "permits courts to admit unconstitutionally obtained evidence if an independent, lawful police investigation inevitably would have discovered it," and "applies whenever an independent investigation inevitably would have led to discovery of the evidence, whether or not the investigation was ongoing at the time of the illegal police conduct." *Price*, 2017 WL 4838307, at *6 (citations omitted).  "The government bears the burden of proving inevitable discovery by a preponderance of the evidence." *United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013).

About two weeks after the agents did an initial review of the defendant's cell phone, the government applied for and obtained a search warrant to do a more complete search of the cell phone.  The government asserts that "[e]ven excising the observations from the initial review of the" cell phone, the affidavit submitted in support of the search warrant "still presented more than sufficient probable cause to justify the issuance of the Search Warrant."  (ECF No. 40 at 19.)  The defendant argues that the government "short-circuits the inquiry," because inevitable discovery doctrine applies only if the Court finds with a "high degree of confidence" "that the phone would have been seized and thus available for search had [the defendant] declined to consent to a search," and that "the government would have sought and obtained a warrant absent the observations made during the earlier encounter."  (ECF No. 41 at 5.)

"[V]iewing affairs as they existed at the instant before" the challenged search, the Court concludes that government would have discovered the evidence on the defendant's cell phone. *Price*, 2017 WL 4838307, at *6 (citations omitted).  Before their initial search of the defendant's phone, the agents "had ample evidence" "providing probable cause to believe [the] [d]efendant

committed the crimes with which he has now been charged." *Id.* Even before they went to the

defendant's apartment, Hutchinson had information from HSI's Cyber Crimes Center that a

Viber account, using the name "Jason," was suspected of sharing child pornography in a Viber

chatroom.[12] (H. 12:10-15.) Hutchinson got additional information about the account —

including an email address, physical address, phone number, and IP address — from Viber and

Charter Communications that connected the defendant to the account. (H. 13:8–15:11.) Then,

during the interview, and before Hutchinson made any of the challenged comments, the

defendant admitted that he used his cell phone to get into Viber chatrooms in which child

pornography was sold and exchanged. He also admitted that he had received child pornography

and that his Viber account was still active. (ECF No. 38-2, Investigation Report at 3; ECF No.

39, Audio Recording at 08:42–09:00; 09:55–10:12.) The defendant does not contend that these

statements were involuntary.

Moreover, the Court credits Hutchinson's testimony that he would have applied for a

search warrant even if the defendant had refused to speak with him, because he thought there

was probable cause that the defendant was in the Viber chatroom where child pornography was

distributed. (H. 29:19–30:19.)

Under these circumstances, the agents would have sought and obtained a warrant to seize

and search the cell phone. *See United States v. O'Brien*, 498 F. Supp. 2d 520, 547 (N.D.N.Y.

2007), *aff'd*, 303 F. App'x 948 (2d Cir. 2008) ("The warrant process was inevitable. Viewing

affairs as they existed the moment before any constitutional violation—potential or otherwise—

---

[12] Hutchinson was entitled to rely on the information he got from the Cyber Crimes Center pursuant to the
collective knowledge doctrine, also known as the fellow officer rule. *See United States v. Colon*, 250
F.3d 130, 135 (2d Cir. 2001) ("The collective knowledge doctrine was developed in recognition of the
fact that with large police departments and mobile defendants, an arresting officer might not be aware
of all the underlying facts that provided probable cause or reasonable suspicion, but may nonetheless
act reasonably in relying on information received by other law enforcement officials.").

the court has already factually found that [the agents] would have sought a warrant, if necessary, at each stage of the unfolding events."); *Price,* 2017 WL 4838307, at *6 ("In this case, the court concludes that such inevitability exists and that the two telephones [and the evidence obtained through those telephones] would have been lawfully obtained by a later-issued warrant" because the "officers had reliable evidence that the phones contained evidence of crimes").  Finally, the warrant that Judge Cho signed "was supported by probable cause independent of" the information based on the initial search of the defendant's cell phone.  *O'Brien,* 498 F. Supp. 2d at 547.  Suppression is thus unwarranted under the inevitable discovery doctrine.[13]

## CONCLUSION

For these reasons, the defendant's motion to suppress his cell phone, its contents, and all fruits obtained as a result of the search is denied.


**SO ORDERED.**

s/Ann M. Donnelly

_____
ANN M. DONNELLY
United States District Judge


Dated: Brooklyn, New York
     October 23, 2025

---

[13] The Court does not address the government's good faith argument, because the search warrant was valid.